1 John P. Aldrich, Esq.
  Nevada Bar No. 6877
2 Catherine Hernandez, Esq.
  Nevada Bar No. 8410
3 **ALDRICH LAW FIRM, LTD.**
  1601 S. Rainbow Blvd., Suite 160
4 Las Vegas, NV 89146
  Tel:  (702) 853-5490
5 Fax: (702) 227-1975
  jaldrich@johnaldrichlawfirm.com
6
  Joshua M. Lifshitz
7 *[Pro Hac Vice Pending]*
  **LIFSHITZ & MILLER LLP**
8 821 Franklin Avenue, Suite 209
  Garden City, NY 11530
9 Tel: (516) 493-9780
  jml@jlclasslaw.com
10
  *Attorneys for Plaintiff*
11
                    **UNITED STATES DISTRICT COURT**
12
                         **DISTRICT OF NEVADA**
13

14 | KEITH KOLISH, Individually and on Behalf of | Case No. |
   | All Others Similarly Situated, | |
15 | | **CLASS ACTION COMPLAINT FOR** |
   | Plaintiff, | **VIOLATION OF THE FEDERAL** |
16 | | **SECURITIES LAWS** |
   | v. | |
17 | | **JURY TRIAL DEMANDED** |
   | LIVE VENTURES INCORPORATED, | |
18 | JON ISAAC, and VIRLAND A. JOHNSON, | |
   | | |
19 | Defendants. | |

20
21          Plaintiff Keith Kolish ("Plaintiff"), individually and on behalf of all other persons similarly

22 situated, by his undersigned attorneys, for his complaint against Defendants (defined below), alleges

23 the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information

24 and belief as to all other matters from the investigation conducted by and through Plaintiff's attorneys.

25 The investigation includes, without limitation, a review of the following: Defendants' public

26 documents; conference calls and announcements made by Defendants; United States Securities and

27 Exchange Commission ("SEC") filings; wire and press releases published by and regarding Live

28 Ventures Incorporated ("LIVE" or the "Company"); analysts' reports and advisories about the

Company; and information readily obtainable from public sources.  Plaintiff believes that substantial

evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired LIVE securities between November 7, 2016 and January 6, 2017, both dates inclusive (the "Class Period").  Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.     LIVE is a Diversified Growth Holding Company with a focus on acquiring U.S. companies.  The Company began trading on The NASDAQ Capital Market under the symbol LIVE on February 8, 2002.

3.     Throughout the Class Period, Defendants violated the federal securities laws by disseminating false and misleading statements to the investing public.  As a result of Defendants' false statements, LIVE's stock traded at artificially inflated prices during the Class Period, reaching a high of $27.68 per share on December 28, 2016, the day the Company issued a press release which reported inflated and false figures concerning the Company's earnings per share, as detailed herein.

4.     According to a January 6, 2017 article by Richard Pearson ("the Pearson article"), the Company paid a host of individuals and companies to publish articles touting the Company, its business and future prospects.  According to the Pearson article, among those participating in this misleading promotional campaign was Michael J. Markowski ("Markowski").  In 2001, Markowski was charged by the SEC with a host of securities fraud violations and sanctioned with a lifetime bar from the securities industry.[1]

5.     In a six-week time frame between November 2016 and December 2016, Markowski published at least nine articles urging investors to buy LIVE's stock "at market."  During this same period the Company's stock price became artificially inflated, rising from $11.58 per share on

---

[1] *See In the Matter of Michael J. Markowski*, SEC Release No. 44086 (Mar. 20, 2001) (Order Imposing Remedial Sanction), *available at* https://www.sec.gov/litigation/opinions/34-44086.htm.

November 8, 2016 to $27.68 on December 28, 2016.  Upon information and belief, Markowski receives income from companies for publishing favorable articles about them in an effort to raise the company's stock price.

6.      On January 6, 2017, an article was published on *SeekingAlpha.com* by Richard Pearson reporting that LIVE had reported a false earnings per share number in its December 28, 2016 press release (which was contradicted by the Company's Form 10-K filed the following day), and paid money to Markowski and others to publish articles praising the Company and its prospects and to spearhead a misleading informational campaign aimed at boosting its stock price.

7.      On this news, the Company's stock dropped from $20.67 on January 5, 2017 to close at $18.05 on January 6, 2017, a loss of $2.62 per share, or approximately 13%, on unusually heavy volume of 1.488 million shares.

8.      As a result of Defendants' false and misleading statements, LIVE securities traded at artificially inflated prices during the Class Period.  However, after the above revelations seeped into the market, the Company's securities continued to fall, sending the Company's stock price down nearly 48% from its $27.68 Class Period high.

## JURISDICTION AND VENUE

9.      The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R §270.10b-5).

10.      This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

11.      Venue is proper in this District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as the Companies principal executive offices and headquarters are located in this District, the Company is a Nevada corporation, and a significant portion of the Defendants' actions, and the subsequent damages, took place within this District.  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this District.  Many of the acts charged herein, including the preparation and dissemination of materially false and/or misleading information, occurred in substantial part in this District.

12.    In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications, and the facilities of the national securities exchange.  Additionally, Defendants named herein, individually and collectively, have sufficient minimum contacts with this District, so as to render the exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice.

**THE PARTIES**

13.    Plaintiff Keith Kolish ("Plaintiff"), as set forth in the accompanying certification, incorporated herein by reference, purchased LIVE common stock at an artificially inflated price during the Class Period, and was harmed when the true facts were revealed and the artificial inflation was removed from the price of the stock at the end of the Class Period.

14.    Defendant LIVE is a Nevada corporation with its principal executive offices located at 325 East Warm Springs Road, Suite 102, Las Vegas, Nevada 89119.

15.    Defendant Jon Isaac ("Isaac") is, and has at all relevant times been, the Company's Chief Executive Officer ("CEO"), President, and director.  Defendant Isaac joined the Company in December 2011, and became President and CEO in January 2012.  Defendant Isaac is also the founder of the Isaac Capital Group, the Company's largest stockholder with approximately 49.5% of the Company's outstanding shares of common stock at the time of the events described herein.  By virtue of his control over the Isaac Capital Group, Defendant Isaac has the sole power to vote the shares of LIVE's common stock owned by Isaac Capital Group, and as a result, is able to effectively control all matters that require the Company to obtain shareholder approval, including the election of directors to LIVE's Board of Directors and approval of significant corporate transactions, such as a merger or other sale of our company or its assets.

16.    Defendant Virland A. Johnson ("Johnson") is the Company's Chief Financial Officer ("CFO").  Defendant Johnson joined the Company in November 2016 as a consultant and is touted by the Company as having "25+ years of experience is primarily in the areas of process improvement, complex debt financings, SEC and financial reporting, turn-arounds, corporate restructuring, global

finance, merger and acquisitions and returning companies to profitability and enhancing shareholder value."

17.    Defendants Isaac and Johnson are collectively referred to herein as the "Individual Defendants."

18.    Defendant LIVE, along with the Individual Defendants, are referred to herein as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background of the Company

19.    LIVE is a holding company for diversified businesses.  The Company has multiple segments, which include manufacturing, marketplace platform, and services.  As of September 30, 2016, the Company operated its business through 13 divisions, each specializing in a distinct area of the business.

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

20.    On November 7, 2016, the Company issued a press release announcing that LIVE had acquired Vintage Stock, Inc. ("Vintage"), a Missouri-based retail chain that buys, sells, and trades entertainment products such as DVDs, CDs, and VHS movie and music tapes.  The press release stated, in pertinent part:

LAS VEGAS, **NOVEMBER 7, 2016** – Live Ventures Incorporated (Nasdaq: LIVE) ("Live Ventures" or the "Company"), a diversified holding company, today announced it has acquired 100% of the outstanding stock of entertainment retailer, Vintage Stock, Inc., in a cash and debt transaction valued at approximately $60M. The acquisition was financed by Texas Capital Bank (NASDAQ: TCBI) and Capitala Group (NASDAQ: CPTA). Live Ventures did not issue any stock or convertible securities in connection with this transaction. As a result of this highly accretive acquisition, *management expects Live Ventures' assets to increase to over $100M, annual sales to increase to $160M and net income to increase to $20M ($1.21 per share).*

Vintage Stock, along with its sub-brands, VStock, Movie Trading Company, and EntertainMart, is a Joplin, Missouri-based retail chain that buys, sells and trades entertainment products. Its product offerings include movies, music, video games for multiple consoles, as well as books, trading and game cards and collectables, including comic books, movie memorabilia, toys and novelties. The company operates 57 stores across 10 states and employs about 900 people. The acquisition increases Live Ventures' total employee count to about 1,200.

"Vintage Stock has proven quarter after quarter that it matches precisely our criteria for acquisition: very consistent and stable earnings over the past several years, an easy to understand business model, and a stellar management team. As a result of this highly

accretive acquisition, we expect our financials to continue to improve significantly. This acquisition marks $100M in deals since we changed LiveDeal into a diversified holding company just last year," said Jon Isaac, CEO of Live Ventures Incorporated. "Vintage Stock's CEO, Rodney Spriggs, is truly a one-of-a-kind executive who has achieved tremendous success creating a unique and highly-profitable business model and expanding it systematically since the company's humble beginnings in 1980 as a used bookstore. We are proud to welcome Vintage Stock and its approximately 900 employees to the Live Ventures family."

21.     On November 21, 2016, the Company issued a press release announcing preliminary financial results for the quarter ended September 30, 2016.  In the press release, the Company noted that it expected record year-end financial results.

22.     Further, Defendant Isaac stated, in pertinent part:

We anticipate that our financials will improve even further as a result of the aggressive measures we take to pay down debt, our recent growth capital expenditures at Marquis Industries, Inc., and our recently announced acquisition of Vintage Stock, Inc. . . . In the meantime, we anticipate that our year-end financial results will be a record for the Company, and will announce them toward the end of December.

23.     Also on November 21, 2016, Markowski published an article on *Seeking-Alpha* entitled "Headwinds For S&P; Tailwinds For Small And Micro-Caps," in which Markowski repeated Defendant Isaac's above assertions with an even greater level of certainty:

Live Ventures (NASDAQ:LIVE) with a market cap of $48 million has grown its revenue for three consecutive fiscal years. Based on its trailing 12 month financials the conglomerate's revenue will again increase for its year ending September 30, 2016. More importantly, after reporting negative CFFO for its last 3 fiscal years LIVE has produced positive CFFO for its last four consecutive quarters. Earlier this month LIVE announced that they had acquired a company for cash and debt that would take their revenue to $160 million and net income to $20 million ($1.21 per share). LIVE's business model is similar to Berkshire Hathaway's (NYSE:BRK.B) and has 33 year old CEO who is extremely disciplined. He reminds me of Buffet.

24.     At the end of the November 21, 2016 article, Markowski represented to his readers that, "I wrote this article myself, and it expresses my own opinions. I am not receiving compensation for it. I have no business relationship with any company whose stock is mentioned in this article."

25.     In the wake of the November 8 and 21, 2016 representations described above, the Company's share price surged, with shares rising from $11.58 on November 8, 2016 to nearly $28 by late December 2016.

26.     On December 9, 2016, the Company issued a press release announcing that it had completed a 1-for-6 reverse split of its outstanding common stock.  The Company stated:

As previously stated, one primary purpose of the reverse split was to broaden the appeal of the Company's stock to include institutional investors following the closing of the Company's second major acquisition in the past 18 months. Management continues to believe the Company's stock is undervalued and the Company continues to repurchase its shares in the market.

Further, the reverse split was not undertaken to facilitate any financing transactions nor for NASDAQ compliance reasons, as the Company is in full compliance with all relevant NASDAQ standards.

As a result of the reverse stock split, every six shares of the Company's pre-reverse split common stock was combined and reclassified into one share of common stock. Further, the reverse stock split does not affect proportionate voting rights and other rights of common stockholders. Stockholders who would otherwise hold a fractional share of common stock received an increase to their common stock as the common stock was rounded up to a full share. No fractional shares were issued in connection with the reverse stock split.

27.     On December 29, 2016, the Company filed its annual report on Form 10-K with the SEC containing its year end financials (the "2016 10-K") and issued an accompanying press release. In press release, the Company noted that its annual sales were only $120 million, falling short of prior predictions of $160 million which was in large part based upon the Company's false and misleading statements concerning the likely impact the acquisition of Vintage would have on company earnings.

28.     On December 28, 2016, LIVE issued a press release entitled, "Live Ventures Announces Biggest Year in Company History Achieving Record Earnings of $8.92 Per Share With Continued Growth Anticipated in 2017." The Company mentioned in the article that "Live Ventures' financial results were filed today with Securities and Exchange Commission (SEC)," as if it were reporting in the press release the same figures reported to the SEC. It was not. In the Company's 2016 10-K, filed on December 29, 2016, LIVE reported its earnings per share as $6.33 undiluted and $5.40 diluted. In fact, the $5.40 earnings per share reported by the Company in its 2016 10-K was also inaccurate since it was the result of onetime GAAP earnings manipulation without which, the Company would have had to report that it actually experienced a net loss for fiscal year 2016.

29.     The December 28, 2016 press release stated:

**LIVE VENTURES INCORPORATED**

12/28/2016 | Press release | Distributed by Public on 12/28/2016 06:01
**Live Ventures Announces Biggest Year in Company History Achieving Record Earnings of $8.92 Per Share With Continued Growth Anticipated in 2017**

Live Ventures Announces Biggest Year in Company History Achieving Record Earnings of $8.92 Per Share With Continued Growth Anticipated in 2017

LAS VEGAS, Dec. 28, 2016 (GLOBE NEWSWIRE) -- Live Ventures Incorporated (Nasdaq:LIVE) ('Live Ventures' or the 'Company'), a diversified holding company, announces today financial results from its fiscal year-end 2016.

Reporting its most successful year in the Company's history, Live Ventures reported a record $79M in revenues, an increase of 136 percent over the previous year, and net profit of approximately $17.82M, representing earnings per share (EPS) of $8.92.

Stockholders' equity, which is management's preferred measurement for performance, increased by 192 percent over 2015. Since present management took over five years ago, stockholders equity has grown at a rate of 100.58 percent compounded annually.

'Live Ventures has truly come a long way since its founding in 1968, when we were known as Nuclear Corporation of New Mexico,' said Jon Isaac, CEO of Live Ventures Incorporated. 'We are elated with these most recent results and are grateful for the hard work of our employees, who were essential to the Company's recent success.'

The company's outstanding year-end results were partially attributable to the stellar performance at its wholly owned subsidiary, Marquis Industries, and partially to other non-cash income realized in connection with the Company's deferred tax assets. These net operating losses (NOLs) were accumulated prior to Live Ventures becoming a diversified holding company and allow it to defer over $30M in future income. The NOLs provide the company a unique advantage in that it can keep a substantial portion of its income -- which normally would have been expensed at approximately 35 percent for taxes, and redeploy it in other areas such as stock repurchases, retirement of debt, or new acquisitions. Although a portion of this year's earnings was attributable to its deferred tax assets, management believes the growth factors explained below will offset non-cash income realized during this year.

**Outlook for 2017**

The Company expects multiple factors to impact growth 2017. Management anticipates revenues to increase by well over 50 percent, easily surpassing $120M, and stockholders' equity to grow at a high double-digit rate. In addition, since the acquisition of Vintage Stock closed several weeks after our fiscal year end, none of the results from Vintage Stock is included in this financial report, all of which will figure prominently into the Company's upcoming 10Q filing and future financial results.

Management further expects additional growth in 2017 as a result of recent capital expenditures made at Marquis Industries to expand its highly successful turf product, which has generated enough demand to be backordered by several months. Finally, in furtherance of the Company's previously announced strategic focus to make accretive acquisitions, such as Marquis Industries and Vintage Stock, management is evaluating several additional acquisition targets, which, if successful, would significantly further increase revenues, and potentially EPS, while not requiring the issuance of stock or convertible securities.

'We are extremely optimistic for the growth we expect in 2017. This has been a record year for the Company, in terms of the pace at which we acquired assets, our financial success, and our ability to act quickly when we find an acquisition that fits our profile,' said Jon Isaac, CEO of Live Ventures. 'We look forward to the opportunity to report continued successes.'

Live Ventures' financial results were filed today with Securities and Exchange Commission (SEC) and can be accessed via the Company's website in the investor relations section, or by visiting the SEC's website.

**About Live Ventures Incorporated**

Live Ventures Incorporated is a diversified holding company with several wholly owned subsidiaries and a strategic focus on acquiring profitable companies that have demonstrated a strong history of earnings power. Live Ventures Incorporated provides, among other businesses, marketing solutions that boost customer awareness and merchant visibility on the Internet. The Company operates a deal engine, which is a service that connects merchants and consumers via an innovative platform that uses geo-location, enabling businesses to communicate real-time and instant offers to nearby consumers. In addition, it maintains, through its subsidiary, ModernEveryday, an online consumer products retailer and, through its subsidiary, Marquis Industries, a specialty, high-performance yarns manufacturer, hard-surfaces re-seller, which is a top-10 high-end residential carpet manufacturer in the United States. Marquis Industries, through its A-O Division, utilizes its state-of-the-art yarn extrusion capacity to market monofilament textured yarn products to the artificial turf industry. Marquis is the only manufacturer in the world that can produce certain types of yarn prized by the industry. Most recently, the company acquired Vintage Stock, Inc., an award-winning entertainment featuring movies, classic and new video games, music, collectible comics and toys, and the ability to special order and ship product worldwide to the customer's doorstep. Vintage Stock is America's largest entertainment superstore chain.

In December, Isaac Capital Group, our largest stockholder, agreed to lock up all of their shares for five years (through December 31, 2021). To ensure that lock-up arrangement, they exchanged all of their shares for a series of 'common equivalent' preferred stock, which is not redeemable; has no liquidation preference and virtually identical dividends (if any are declared); has no board seats and votes with the common stock; and is convertible back into common stock without any dilution (based on its original exchange from common stock). Accordingly, our common stock was reduced from approximately 2.8 million to 2.0 million shares.
[Forward looking statement disclaimer not reprinted]

30.    Following the filing of the 2016 10-K, on January 1, 2017, Markowski published an article on *Seeking-Alpha*, touting the Company's business and prospects:

**Seeking Alpha: What is one of your favorite picks for 2017, and, in a sentence or two, why?**
My pick, Live Ventures, Inc. (NASDAQ:LIVE), was one of the micro-caps that I recommended in my November headwinds and tailwinds article. I am also predicting that LIVE shares will be the top performer for the stock market in 2017 even though its share price has already increased by 50% since being recommended. LIVE shares rank as my best ever micro-cap find ever for the following reasons:
- Shares extremely liquid for a micro-cap.
- Very dynamic 33 year old CEO who stepped in to turn around company has since acquired 40% of its shares outstanding.
- Based on my free cash flow analysis the shares are insanely undervalued.
- Diversified holding company business model identical to Berkshire Hathaway's (NYSE:BRK.A) (NYSE:BRK.B).
- Grew by 100% for fiscal 2016 and will continue to grow at 50% to 100%.

31.     At the conclusion of the January 1, 2017 article, Markowski represented to his readers that, "I wrote this article myself, and it expresses my own opinions. I am not receiving compensation for it. I have no business relationship with any company whose stock is mentioned in this article."

32.     On January 6, 2017, Richard Pearson ("Pearson") published an article on *Seeking-Alpha*, alleging that from November 2016 through December 2016, the Company's stock had been artificially inflated as a result of aggressive paid promotions.  In the January 6, 2017 article, Pearson stated, in pertinent part:

> Live Ventures' stock has shown a repeated pattern over time. When the stock trades at a very low price, a reverse split occurs to raise the price up and reduce the float. At the same time, some new acquisition or corporate development is announced. Simultaneous paid promotions (which have now run into the millions of dollars) help to temporarily drive the stock up. But when the business fails to produce results, the stock price falls again and the process is repeated.
>
> The most recent promotion campaign saw the stock triple in November to December 2016.
>
> As in the past, there was a reverse split which coincided with some sort of "news". As in the past, there is the presence of heavily compensated stock promoters. And as in the past, the stock price quickly showed a reaction, tripling in a few weeks.
>
> *     *     *
>
> Again, the point I am trying to make is that when we see this combination of problems, we should immediately start to be highly concerned about the author and his content.
>
> But this content didn't come from just any author. It came from Michael Markowski. That makes the problem visibly much bigger.

33.     Markowski has a long disciplinary history with the SEC, and was barred by the SEC in 2001 from associating with any securities broker or dealer.  The SEC described Markowski's conduct as "egregious" in that he knowingly and recklessly manipulated the market prices of three different securities, "including aggressive and fraudulent sales practices, unlawful solicitation of aftermarket orders during initial public offerings, and delayed execution of the sell orders" of securities customers.

34.     In its opinion issuing injunctive relief against Markowski, the SEC stated the following:

> Markowski and Joseph Riccio, the firm's trader, knowingly or recklessly manipulated the market prices of the securities of three issuers, Capucino's, Mountaintop, Inc. ("Mountaintop"), and Auto Depot, Inc. ("Auto Depot"), beginning with their initial public offerings and continuing through at least November 1990. The complaint alleged that Markowski and Riccio conducted **aggressive and fraudulent sales campaigns to**

**promote the securities, which included making specific price predictions about the securities. . . .**

**Markowski's conduct was egregious**. The complaint in the injunctive action describes the manner in which Markowski knowingly and recklessly manipulated the market prices of three Global-backed securities, including aggressive and fraudulent sales practices, unlawful solicitation of aftermarket orders during initial public offerings, and delayed execution of the sell orders of Global customers.

**Markowski's testimony bespeaks a complete lack of understanding of, and appreciation for, the regulatory scheme governing the securities industry.**[2]

35.     In his January 6, 2017 article, Pearson connected the dots between Markowski's prior conduct and his promotion of LIVE stock:

As I see it, Mr. Markowski has acted in a similar fashion with Live Ventures. He seeks to drive up the price in the same way, by inciting "market orders" in a small cap, low float stock. He continues to urge additional buying even as the share price soars, continually raising his target price, using specific prices as he did in the fraudulent conduct above. He then seeks to dissuade investors from selling even as the share price begins to fall apart.

\*        \*        \*

Here is a brief list of just a few of the inaccurate statements made by Mr. Markowski in his articles:

1. For Live, he stated that "Before conducting any additional analysis, I checked out their auditor. I discovered that it was Anton & Chia, which is one of the most respected and SEC approved auditing firms."[3] As shown in the next section. Anton & Chia was cited in September 2016 for multiple egregious audit deficiencies, their clients list largely consists of imploded reverse mergers for China/Asia OTC stocks, many of which either trade for just pennies or no longer report or trade.

---

[2] *In the Matter of Michael J. Markowski*, Opinion of the Commission, *available at* https://www.sec.gov/litigation/opinions/34-44086.htm.

[3] A 2015 inspection conducted by the PCAOB revealed the following:

Certain deficiencies identified were of such significance that it appeared to the inspection team that the Firm, at the time it issued its audit report, had not obtained sufficient appropriate audit evidence to support its opinion that the financial statements were presented fairly…In other words, in these audits, the auditor issued an opinion without satisfying its fundamental obligation to obtain reasonable assurance about whether the financial statements were free of material misstatement….Whether or not associated with a disclosed financial reporting misstatement, an auditor's failure to obtain the reasonable assurance that the auditor is required to obtain is a serious matter. It is a failure to accomplish the essential purpose of the audit, and it means that, based on the audit work performed, the audit opinion should not have been issued.

*Report on 2015 Inspection of Anton & Chia, LLP*, PCAOB (Sep. 29, 2016), *available at* https://pcaobus.org/Inspections/Reports/Documents/104-2016-176-Anton-Chia.pdf.

2. He also stated that LIVE had positive Free Cash Flow of positive $2.0 million in Q4 2016. This is provably wrong. In fact, Live Ventures had a Free Cash Flow of NEGATIVE $2.5 million. As a self described "cash flow expert", Mr. Markowski should certainly be familiar with the standard definition of FCF: "Free cash flow (FCF) is a measure of a company's financial performance, calculated as operating cash flow minus capital expenditures." It is actually very simple and well defined. Yet for some reason, Mr. Markowski decided to add $3.3 million back for prepaid expenses. This is simply an arbitrary adjustment made by Mr. Markowski to arrive at a positive number.

3. On December 20th, Markowski stated that Live Ventures has an extremely rare "Free Cash 50% yield". As of that date, Live Ventures was already trading at $20, which would mean that Live Ventures was generating Free Cash Flow of $10 per share, or $28 million. Even using the exaggerated numbers provided above does not come anywhere near $28 million in FCF in 2016. And then it gets even better. Markowski states that: "Due to LIVE having an extremely rare Free Cash 50% Yield anomaly its share price will go to a minimum of $50.00 in 2017 regardless of how the S&P 500 performs."

4. Stock "bulls" commonly try to blame short sellers when a stock price implodes. They try to use this to convince retail buyers to buy the stock. Markowski stated that "Based on 2.2 million shares trading on December 28th, the probability is high that short sales accounted for a significant percentage of the volume." In fact, we can see the amount of short interest over time at NASDAQ.COM. Over the past 4 months, total short interest has ranged from 70,000-90,000, so nothing near the millions of shares that Markowski implies. From the site iBorrowDesk, we can see that total additional shares available to be shorted have seldom been more than 25,000 on any given day. And before he tries to blame the "naked shorting" bogeyman (another favorite excuse and distraction for stock "bulls"), we can see that the SEC also tracks the total amount of shares being shorted "naked." It is called their "fail to deliver list." For Live Ventures, the most recent number of "failed to deliver" (i.e. naked shorted) shares amounted to just 4,054 shares (yes, just four thousand shares). The reality is that short sales have accounted for virtually none of the volume. Anyone who claims 40 years in the industry should be able to find this information in just a few minutes.

5. Markowski states that "CEO Jon Isaac owns 1.1 million shares". As shown below, Isaac controls over 1.5 million shares, nearly half of which are available for immediate sale via warrant exercise. That is a difference of nearly $10 million into the CEO's pocket and is directly relevant when we are looking at stock promotions.

Beyond the inaccuracies we can see multiple statements which are deeply reckless in his explicit buy "recommendations."

1. Mr. Markowski urges investors to place "at market" purchase orders

2. He also urges investors to place "Good Til Canceled Limit Orders" to buy at a price of $26.25 (even as the share price was plunging to $22). The effect of this would obviously be to support the share price.

3. He makes statements such as: "Due to LIVE having an extremely rare Free Cash 50% Yield anomaly its share price will go to a minimum of $50.00 in 2017 regardless of how the S&P 500 performs."

4. Assuming that LIVE's outstanding shares remain at 2.8 million the minimum price for their shares by the end of 2017 could potentially range from $45 to $180.00.

5. "LIVE's shares are being shorted instead of being aggressively purchased. It is because should an investor or conduct a preliminary analysis and not dig much deeper the tendency is to short instead of buying LIVE shares. Upon investors becoming aware of this anomaly the share price will go to above $100. This report will enable you to fully grasp the significance of the anomaly and why a short squeeze is inevitable." As shown above, anyone with even a few years of experience in the market would know that this information is provably false with just a few minutes of looking.

36.     Pearson went on to discuss the Company's acquisition of Vintage, stating:

On November 7th, Live Ventures announced the acquisition of Vintage Stock, a retailer which buys and sells things like used movies (including VHS), music CD's and video games. The cost of the acquisition was $60 million and was done via bank financing (i.e. no stock was issued).

At the time of the acquisition, the stock barely budged. On the day before the acquisition, the stock sat at $10.98. On the day the acquisition was announced, the stock hit $11.52, up a few percent. On the next day, the stock was flat. No one cared.

The reason for the lack of enthusiasm is that trading music CDs and old video games in retail stores is not a growth business anymore. Much of this is now simply done online. Videos, music and games can simply be downloaded without visiting a store. If I want to buy a physical copy, I do so via Amazon for a fraction of the price.

Vintage continues to engage in activities such as movie and video game rentals, just like the now bankrupt Blockbuster. In fact, Vintage actually acquired many of their Dallas area stores directly from Blockbuster and brags that it now offers "over a million titles to choose from in Movies, Music and Video Games."
Following the **going-out-of-business** of their local competitor Hastings, Vintage simply moved in to that location in Kerryville, TX. Vintage hopes it will do better than their **bankrupt** predecessor.

Vintage also bought a few locations of Borders Books as that company too was going **bankrupt**. Vintage has stated that it follows an 80-20 rule, where the 20% consists of selling books and magazines, just like the **bankrupt** Borders used to do.

Vintage also engages in the odd niche business of repairing scratched music CDs, for those out there who still use music CDs.

Vintage even continues to carry game cartridges for vintage consoles such as Atari and the old Nintendo, which were popular in the 1980s.

There was no detailed 8K released with legacy or pro forma financials, such that we don't really know what Live Ventures purchased here. But we do know that Vintage has 40 locations spanning 5 states, with 900 employees, such that getting $60 million in bank financing should not have been difficult for the company. Vintage could have certainly borrowed that much money itself.

For example, if Vintage owns $60 million of real estate, the Live Ventures could have just paid $60 million in exchange for $60 million in real estate, with the business itself being largely worthless.

But as we have seen, stock promoters needed some fodder for their promotions. And even though Live Ventures was clearly stepping into the shoes of several bankrupt predecessors, the promoters were able to spin it for a few weeks.

The website for Vintage describes their inventory of videos, music and games as being "massive". So a second theory is that the "value" here was simply that of overvalued obsolete inventory. After all, what are rental DVD's worth today now that everyone can simply stream from Netflix (NASDAQ:NFLX), Hulu or Amazon (NASDAQ:AMZN) for just a few dollars without ever leaving their home. If Live Ventures is valuing these rental videos "at cost" of $20 or more, then a $60 million valuation could be easily justified. But obviously older titles of used rental videos now have a value which is almost nil.

Because there has been no detailed 8K filed, we simply have no idea.

But just as with the other items of fodder, the promoters have been quick to predict multi bagger share price increases based on the minuscule amount of vague and unsubstantiated information released by Live Ventures.

(Note: Here is an example of a typical 8K that virtually all companies put out upon completion of an acquisition. It contains all of the relevant historical and pro forma financial information along with the detailed terms of the transaction and financing.)

It is notable that at the time Live Ventures announced the deal in November, that annual sales were immediately expected to increase to $160 million. But just a few weeks later, this number was already quickly being reduced to $120 million. They had therefore been overstated by 33%. No explanation for the steep revision was given.

The point is this. Live Ventures completed this acquisition in November and immediately put out a press release touting several unsubstantiated forecasts. Live Ventures never put out an SEC filed 8K with any concrete details. As we have seen in the past, there have been substantial discrepancies between Live Ventures press releases and their SEC filings. We literally have no idea what Live Ventures has purchased here because nothing has been disclosed. The company is already backing away from their initial vague rosy statements.

But so far the promoters behind Live Ventures have been quick to seize on the acquisition as further proof that the stock is going to catapult upwards by several hundred percent in 2017.

Even a casual analysis of Vintage reveals that the company is in various dying businesses including DVD and VHS rentals, CD music exchange and CD/DVD scratch repair. Vintage has repeatedly been buying out the locations of other dying businesses such as Blockbuster, Borders and Hastings, all of which went bankrupt / out of business.

37.     Pearson then turned to the Company's December 28, 2016 press release in which the Company stated that Defendant Isaac (through Isaac Capital Group) had "locked up" all of his shares:

In December, Live Ventures announced that:

In December, Isaac Capital Group, our largest stockholder, agreed to lock up **ALL** of their shares for five years (through December 31, 2021)… Accordingly, our common stock was reduced from approximately 2.8 million to 2.0 million shares.
Isaac Capital Group is controlled by Live Venture's CEO Jon Isaac. He is the largest shareholder.

The message here is clear. The CEO cannot sell any of his shares until 2021. Clearly, this is a strong vote of confidence in the stock, and it has helped support the share price.

**But that assumption is wrong. The following information can be found in the footnotes (part F-19) of the 10K.**

If we look at warrants / options held by Jon Isaac and/or his Isaac Capital Group, we can see that he has control of more than 1.5 million underlying shares in total. This includes almost 590,000 shares underlying his warrants. These warrants have an average exercise price of just $4.14 and they actual EXPIRE in less than 2 years. **THE WARRANTS ARE EXERCISEABLE IMMEDIATELY**.

So here is the kicker, by appearing to lock up "ALL" of his common stock, the CEO supports the share price. He therefore can get a much higher price when he sells nearly 700,000 other shares that no one seems to have noticed. Even if the original shares go to zero in 5 years, the CEO would stand to make more than $10 million if sold at current prices. Without giving the "appearance" of a lockup, this would not otherwise be possible for the CEO.

And again, the warrants can be exercised for just $4.14, they are exercisable immediately and they EXPIRE in less than 2 years. The "lockup" is nonsense.

But it gets even better. In order to effect this apparent "lockup", the CEO "converted" his 800,000 shares of common stock into basically identical preferred shares. As a result, when Live Ventures announced their EPS for 2016, they divided their "earnings" by 2 million shares rather than 2.8 million shares. This is how the company seemingly reported an EPS of $8.92.

Live Ventures Announces Biggest Year in Company History Achieving Record Earnings of $8.92 Per Share With Continued Growth Anticipated in 2017

But that $8.92 was **ONLY** announced in the **flashy press release**. It was not included in the SEC filed 10K. (Feel free to run a text search through the 10K for yourself). In the actual SEC filings, we can see that Live Ventures was forced to report the actual EPS number of $5.40.

And as we see next, even that $5.40 was EPS was only the result of one-time GAAP earnings manipulation. Without that manipulation, the company actually would have **reported a NET LOSS,** NOT ANY NET INCOME AT ALL.

38.    On this news, the Company's stock dropped from $20.67 on January 5, 2017 to close at $18.05 on January 6, 2017, a loss of $2.62 per share, or approximately 13%, on unusually heavy volume of 1.488 million shares.

39.    As a result of Defendants' false statements, LIVE securities traded at artificially inflated levels during the Class Period.  However, after the above revelations seeped into the market, the Company's securities continued to decline, with the Company's stock price plummeting nearly 48% from its $27.68 Class Period high.

40.     On January 9, 2017, the Company issued a response letter to the Pearson article (which the Company described as a "negative article[s] recently written about us by those attempting to manipulate our stock for their own profit").  In the Company's response to the Pearson article, the Company at no point denied Pearson's allegations that the Company utilized the services of paid stock promoters including Markowski (who represented at the conclusion of his articles that he was not paid to write the article).  Nor did or could the Company deny that it had reported to investors on December 28, 2016, that the Company's earnings per share for fiscal year 2016 was $8.92, but reported the next day to the SEC in the Company's 2016 10-K, filed on December 29, 2016, that LIVE's earnings per share was $6.33 undiluted and $5.40 diluted.  Nor did the Company, in its response to the Pearson article, even attempt to respond to the lion's share of Pearson's specific accusations.

## LOSS CAUSATION

41.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

42.     During the Class Period, Plaintiff and the Class purchased LIVE's securities at artificially inflated prices and were damaged thereby.  The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## CLASS ACTION ALLEGATIONS

43.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired LIVE securities during the Class Period (the "Class"), and were damaged upon the truth of Defendants stock pumping scheme being revealed.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

44.     The members of the Class are so numerous that joinder of all members is impracticable.  As of the filing of LIVE's annual report on Form 10-K with the SEC on December 29, 2016, LIVE reported 2,789,205 shares outstanding, held by hundreds if not thousands of holders.

45.     Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

46.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

47.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a.   whether the federal securities laws were violated by Defendants' acts as alleged herein;

b.   whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of LIVE;

c.   whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light if the circumstance under which they were made, not misleading;

d.   whether Defendants caused LIVE to issue false and misleading SEC filings and public statements during the Class Period;

e.   whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

f.   whether the prices of LIVE securities during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and

g.   whether the members of the Class have sustained damages, and, if so, what is the proper measure of damages.

48.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SCIENTER ALLEGATIONS

49.    As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding LIVE, their control over, and/or receipt and/or modification of LIVE's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning LIVE, participated in the fraudulent scheme alleged herein.

50.    The scienter of Defendants is further established by their reporting to investors on December 28, 2016, that the Company's earnings per share for fiscal year 2016 was $8.92, and reporting the next day to the SEC in the Company's 2016 10-K, filed on December 29, 2016, that LIVE's earnings per share was $6.33 undiluted and $5.40 diluted.  The reporting of significantly different earnings per share figures, within the span of two days, could not have been accidental.

## PRESUMPTION OF RELIANCE ON
## THE FRAUD-ON-THE-MARKET DOCTRINE

51.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that: Defendants made public misrepresentations or failed to disclose material facts during the Class Period; the omissions and misrepresentations were material; LIVE securities traded in efficient markets; the Company's shares were liquid and traded with moderate to heavy volume during the Class Period; the Company trades on the NASDAQ, and was and is covered by multiple analysts; the misrepresentations and omissions alleged would tend to induce a reasonable

investor to misjudge the value of the Company's securities; and Plaintiff and members of the Class purchased and/or sold LIVE securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

52.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

53.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizen of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### Against All Defendants For Violations of
### Section 10(b) and Rule 10b-5 Promulgated Thereunder

54.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

55.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

56.     During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading.

57.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the or issuance of the statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for LIVE securities.  Such statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about LIVE's finances and business prospects.

58.     By virtue of their positions at LIVE, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby

to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each of the Defendants knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

59.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is within Defendants' knowledge and control.  As the senior managers and/or directors of LIVE, the Individual Defendants had knowledge of the details of LIVE's internal affairs.

60.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of LIVE.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to LIVE's, businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of LIVE securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning LIVE's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired LIVE securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

61.    During the Class Period, LIVE securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of LIVE securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the

purchases and/or acquisitions by Plaintiff and the Class, the true value of LIVE securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of LIVE securities declined sharply upon public disclosure of the facts alleged herein to the injury of the Plaintiff and Class members.

62. By reasons of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

63. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating false and misleading information to the investing public.

## COUNT II

### Violations of Section 20(a) of the
### Exchange Act Against the Individual Defendants

64. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

65. During the Class Period, the Individual Defendants participated in the operation and management of LIVE, and conducted and participated, directly and indirectly, in the conduct of LIVE's business affairs. Because of their senior positions, the Individual Defendants knew the adverse non-public information about LIVE's false financial statements.

66. As controlling parties of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to LIVE's financial condition and results of operations, and to correct promptly any public statements issued by LIVE which had become materially false or misleading.

67. Because of their positions of control and authority, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which LIVE disseminated in the marketplace during the Class Period concerning LIVE's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause LIVE to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were

"controlling persons" of LIVE within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of LIVE securities.

68.    Both of the Individual Defendants, therefore, acted as a controlling person of LIVE. By reason of their disclosed and undisclosed functional positions of senior management positions of LIVE, both of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, LIVE to engage in the unlawful acts and conduct complained of herein.  Both of the Individual Defendants exercised control over the general operations of LIVE and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

69.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by LIVE.

70.    This action was filed within two years of discovery of the fraud and within five years of each Plaintiff's purchases of securities, giving rise to the cause of action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reasons of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

/ / /

/ / /

/ / /

/ / /

/ / /

**DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.

Dated:  May 5, 2017                         Respectfully submitted,

                                            **ALDRICH LAW FIRM, LTD.**

                                            /s/ John P. Aldrich
                                            John P. Aldrich, Esq.
                                            Nevada Bar No. 6877
                                            Catherine Hernandez, Esq.
                                            Nevada Bar No. 8410
                                            1601 S. Rainbow Blvd., Suite 160
                                            Las Vegas, NV 89146
                                            Tel:  (702) 853-5490
                                            Fax: (702) 227-1975
                                            jaldrich@johnaldrichlawfirm.com

                                            Joshua M. Lifshitz
                                            *[Pro Hac Vice Pending]*
                                            **LIFSHITZ & MILLER LLP**
                                            821 Franklin Avenue, Suite 209
                                            Garden City, NY 11530
                                            Tel: (516) 493-9780
                                            jml@jlclasslaw.com

                                            *Attorneys for Plaintiff*

**CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS**

I, KEITH KOLISH, hereby certify that:

I have reviewed the Complaint and authorized its filing for the filing of a Motion for Lead Plaintiff on my behalf. I did not purchase the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action arising under this title. I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary. My transactions in LIVE securities that are the subject of this litigation during the Class Period are attached hereto as Exhibit A. I have not served as or sought to serve as a representative party on behalf of a Class under this title during the last three years. I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the Court, including the award to a representative of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

The foregoing are, to the best of my knowledge and belief, true and correct statements.

03/01/2017

Keith A Kolish

KEITH KOLISH

**Schedule A**

My transactions in ____LIVE_____ securities that are the subject of this litigation during the

class period set forth in the complaint are as follows (P indicates a purchase, S indicates a sale):

| Security | Date | Sale | Purchase | Number of Shares | Price per Share |
|----------|------|------|----------|------------------|-----------------|
| LIVE | 12/28/16 | | YES | 2000 | 31.32 |
| LIVE | 2/24/17 | YES | | 2000 | 16.36 |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |